[Cite as *State v. Daylong*, 2021-Ohio-4192.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

     Plaintiff-Appellee,                    :        No. 19AP-279
                                    (C.P.C. No. 19CR-410)
v.                                               :
                                   (REGULAR CALENDAR)
Donald A. Daylong,                               :

     Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on November 30, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and
*Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Carpenter Lipps & Leland LLP*, *Kort Gatterdam*,
and *Erik P. Henry*, for appellant. **Argued:** *Kort Gatterdam.*

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Donald A. Daylong, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of assault, attempted burglary, attempted trespass in a habitation, disrupting public services, menacing by stalking, and violating a protection order. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed January 25, 2019, plaintiff-appellee, State of Ohio, charged Daylong with one count of assault in violation of R.C. 2903.13, a first-degree misdemeanor; one count of attempted burglary in violation of R.C. 2923.02 and 2911.12, a third-degree felony; one count of attempted trespass in a habitation in violation of R.C.

2923.02 and 2911.12, a fifth-degree felony; one count of disrupting public services in violation of R.C. 2909.04, a fourth-degree felony; one count of menacing by stalking in violation of R.C. 2903.211, a fourth-degree felony; and one count of violating a protection order in violation of R.C. 2919.27, a fifth-degree felony. The indictment related to interactions Daylong had with his former girlfriend, A.M., between September 17 and October 1, 2018. Daylong entered a plea of not guilty.

{¶ 3} Prior to trial, on February 5, 2019, the state filed a notice of its intention to use evidence, pursuant to Evid.R. 404(B) and R.C. 2945.59, of events from 2016 involving Daylong and another former girlfriend. Daylong filed a motion to exclude the other-acts evidence. Following a hearing, the trial court issued a February 6, 2019 decision and entry granting the state's request to use other-acts evidence at trial.

{¶ 4} At a jury trial beginning March 4, 2019, A.M. testified that she began a romantic relationship with Daylong in July 2018 after meeting him at their place of employment. A.M. said the relationship moved quickly and that Daylong spent a lot of time at her apartment while they were dating. After they started dating, A.M. said Daylong left their mutual employer for a new job with a different company. During their relationship, A.M. said Daylong offered to give her some money since he spent so much time at her apartment, and he asked her for a voided check. A.M. said she thought Daylong would just put "a little bit of money" in her account as a one-time occurrence. (Tr. Vol. 2 at 91.) Instead, A.M. said she was surprised to learn that Daylong used the voided check to arrange for his paycheck to be deposited directly into her account.

{¶ 5} A.M. testified that on September 14, 2018, which was a Friday, Daylong told her that "he had been convicted of Breaking and Entering against an ex-girlfriend." (Tr. Vol. 2 at 86.) After learning of Daylong's past, A.M. said she informed him that she wanted to end their relationship. She said she thought about the situation some more over the weekend and then, after Daylong returned to her apartment inebriated and the two had another "falling out" on Sunday, A.M. knew she needed the relationship to be over. (Tr. Vol. 2 at 88.)

{¶ 6} The next morning, September 17, 2018, A.M. said she told Daylong he needed to remove his belongings from her apartment. When Daylong arrived that evening, A.M. testified she asked him to return his copy of the key to her apartment. According to A.M.'s

testimony, Daylong told her he would only return the key if she gave him $1,000. When A.M. told Daylong she was not going to give him the money, she said she moved to take the key from Daylong's hand, but Daylong grabbed her hand and squeezed it hard enough that she thought her bones would break. When A.M. told Daylong he was hurting her, she said Daylong grabbed her other arm and pushed her up against the door, causing the doorknob to hit her back. A.M. testified she then ordered Daylong to leave, and as soon as he left her apartment, she immediately called her apartment's property manager to change her lock.

{¶ 7} A.M. said that the maintenance staff arrived within 30 minutes to change her locks but that Daylong remained in her apartment parking lot near his work van during this time. A.M testified she then received a text message from Daylong saying "hum, that's strange. Your garage door is wide open." (Tr. Vol. 2 at 95.) A.M. said she always kept her garage door closed and locked. A.M. said Daylong continued to send her text messages, writing that he would return to collect his belongings. In response, A.M. said she first asked for her key but then sent him another text telling him not to come over because she was getting her locks changed.

{¶ 8} A.M. called 911 to report the incident, and the state played an audio recording of the 911 call during the trial. During the call, A.M. told the dispatcher that Daylong was trying to get into her apartment, harassing her, and continuing to send her text messages indicating he would "track [me] down" and that he knew how to find her when she was with her kids. (Tr. Vol. 2 at 100.) A.M. said she did not feel safe even after she changed the locks. A.M. also told the dispatcher that she gave Daylong $200 that evening but that he was continuing to refuse to give her the key until she paid him $1,000.

{¶ 9} When police responded to the scene, A.M. said she went with the officer to inspect her garage, and she said the door was open and the lock on the garage door was "busted." (Tr. Vol. 2 at 96.) The responding officer testified A.M. was "nervous and scared." (Tr. Vol. 3 at 350.) Police did not note any injuries on A.M. at the time. Throughout the evening, A.M. said Daylong continued to send her threatening text messages, including listing various establishments where he knew he could find her. Additionally, A.M. said Daylong left her several voicemail messages that night asking for another chance. In between those voicemails, A.M. said she spoke to Daylong on the phone and he told her he was having an "episode," that he was "just going to keep on driving," and that he had already

informed his employer he would not be in to work the next day.  (Tr. Vol. 2 at 115.)  The state introduced GPS records from Daylong's employer confirming that Daylong's work van was at A.M.'s apartment complex the night of September 17, 2018 and that the van was near the apartment at the time he left one of the voicemails.

{¶ 10}  A.M. testified that the next day, September 18, 2018, she noticed she had two bruises and a scrape on her arm from the altercation.  Nonetheless, A.M. said she allowed Daylong to come over that evening because she was afraid he would hurt himself.  A.M. testified that Daylong spent the night with her that evening.

{¶ 11}  The next day, September 19, 2018, A.M. said she went to work and that Daylong wanted to come back to her apartment when she got home.  She told him, however, that she was going to dinner with her children and that he was not invited, that he was not to be around the restaurant, and that he was not to be at her apartment.  A.M. did not see Daylong that day, but she testified he left her another voicemail that day indicating he would call her son if she refused to talk to Daylong.

{¶ 12}  On September 20, 2018, A.M. said she agreed to let Daylong come to her apartment so they could talk about everything that had transpired.  A.M. said Daylong ended up spending the night with her that night.  The next morning, September 21, 2018, A.M. determined the relationship was over for good, and she testified that she told Daylong to remove all of his belongings from the apartment.  A.M. said she waited to go to work until Daylong left her apartment.

{¶ 13}  During the day of September 21, 2018, A.M. said Daylong repeatedly called her and sent her several text messages, including asking her where his bottle of prescription Adderall was, but A.M. said she ignored him.  While she was at work, A.M. said Daylong showed up uninvited and asked for her apartment keys.  A.M. testified her boss intervened and ordered Daylong to leave the property, and A.M. said her boss instructed her to go home and search for Daylong's medication.  A.M. said she drove home and found the medication, but she admitted to emptying some of the Adderall capsules and replacing the medication with sugar.  She then drove to a nearby restaurant where she knew Daylong was, rolled down her window, and threw the bottle of pills at him.  Daylong filed a police report for the missing pills.  A.M. testified she told police that she had returned the pills to

Daylong and, although she initially did not tell police she had altered some of the pills, she testified that she later admitted as much to a detective.

{¶ 14} During the early morning hours of September 22, 2018, A.M. said she awoke to the sound of her doorknob rattling and she could see the lock "wiggling." (Tr. Vol. 2 at 166.) A.M. said she had been sleeping on her couch with a knife and had wedged an end table between her door and the staircase because she was so scared of Daylong. A.M. testified she looked out her window and saw the silhouette of a person with a very distinctive gait and wearing a hat, both characteristics leading her to conclude it was Daylong. A.M. called 911 and police responded, though police did not observe any damage to the door or signs of forced entry, nor did police locate Daylong in the area.

{¶ 15} The next day, September 23, 2018, A.M. said her friend, Dennis Brodbeck, found a letter from Daylong in A.M.'s doorknocker. GPS records showed Daylong's work van was at the apartment complex that morning around 1:00 a.m. A.M. said she spent the rest of the day with Brodbeck and, when she returned home, she found a second letter from Daylong in her doorknocker. Brodbeck came in the apartment with A.M. and the two were watching football when A.M. said her power went out. A.M. testified she looked around at the other apartments and saw that it was only her apartment without power. While she was outside, A.M. said she saw Daylong looking at Brodbeck's car in A.M.'s assigned parking spot. A.M. said Brodbeck chased after Daylong, but Daylong ran away. At that point, A.M. called 911 again. When police arrived, the responding officers examined the apartment building's electrical box and noted that the power had been switched off to A.M.'s apartment. Police eventually located Daylong nearby, and they questioned him but did not detain him.

{¶ 16} On September 24, 2018, A.M. said she noticed she had missed a phone call from the City of Columbus. When she returned the phone call, A.M. said the person told her that no one had called her. Later that day, A.M. said she received another phone call that appeared to be from the City of Columbus. A.M. said she answered the phone but that it was Daylong impersonating a police officer. After that phone call, A.M. said Daylong called her three more times under the guise of phone calls from the City of Columbus. That day, A.M. left work and obtained an ex parte civil protection order against Daylong. A.M. said she had informed Daylong's employer that she was going to seek a protection order

and that, shortly after that phone call, Daylong showed up at the courthouse while she was there.  The protection order required Daylong to stay at least 500 feet away from A.M.

{¶ 17}  After obtaining the protection order, A.M. testified she did not encounter Daylong again until October 1, 2018.  After work that day, A.M. said she went to the Rooster's restaurant in Hilliard but when she arrived, she saw Daylong's work van in the parking lot.  When she entered the restaurant, A.M. said she saw Brodbeck.  A.M. testified that shortly after entering the restaurant, Daylong left the parking lot.  However, A.M. said about 20 minutes later she noticed Daylong's vehicle pull in the parking lot again, approximately 300 feet away from where A.M. was sitting in the restaurant, and Daylong exited his vehicle and began pacing in the parking lot.  A.M. said Brodbeck then went outside to confront Daylong, and Daylong then left the area.

{¶ 18}  The state also presented the testimony of A.B., who dated Daylong from 2014 to 2016.  A.B. testified that after her relationship with Daylong ended in May 2016, he repeatedly called her after she blocked his phone number, sent her hundreds of emails, left beer cans by her porch, drove by her home, parked near her backyard, contacted her employer, made phone calls impersonating the police department's non-emergency line, removed light bulbs from her home's exterior light fixtures, disturbed her home's circuit breaker, removed one of the windows to her basement, broke into her home and poured water on her bed, removed and disabled her security camera, attempted to drill the locks out of her front door, and violated the terms of a protection order she had obtained against him.  The trial court provided the following limiting instruction related to A.B.'s testimony:

> Evidence was received about the commission of crimes, wrongs, and acts other than the offenses with which the Defendant is charged in this trial.  That evidence was received only for a limited purpose.  It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character.
>
> If you find that the evidence of other crimes, wrongs, and acts is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the Defendant's motive, opportunity, intent, preparation, and/or plan to commit the offenses charged in this trial, the identity of the person who committed the offenses

in this trial, and the absence of mistake or accident. That evidence cannot be considered for any other purpose.

Let me caution you that the evidence of the scheme, plan, or system is only one of the things you are to consider in determining identity. The State must prove identity beyond a reasonable doubt. If you find that the Defendant committed the other act, you may not presume that he committed the acts charged. You may, however, consider the other acts along with all other evidence in deciding whether the State has proved beyond a reasonable doubt that the Defendant, rather than some other person, committed the offense charged. You may also decide that the State has failed to prove that a crime occurred at all.

(Tr. Vol. 4 at 701-02.)

{¶ 19} Following deliberations, the jury found Daylong guilty of all six counts. The trial court conducted a sentencing hearing on March 28, 2019 and, after merging the attempted trespassing count into the attempted burglary count, sentenced Daylong to an aggregate prison term of three years. The trial court journalized Daylong's convictions and sentence in an April 1, 2019 judgment entry. Daylong timely appeals.

## II. Assignments of Error

{¶ 20} Daylong assigns the following errors for our review:

[1.] The admission of other-acts testimony and evidence involving an ex-girlfriend violated appellant's rights to due process and to a fair trial as guaranteed by the United States and Ohio Constitutions.

[2.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

[3.] The trial court improperly instructed the jury on disrupting public services and in not allowing defense counsel to argue the definition of "public" to the jury in violation of appellant's due process rights guaranteed by the United States and Ohio Constitutions.

[4.] The admission of other-acts testimony involving a prior conviction violated appellant's rights to due process and to a

fair trial as guaranteed by the United States and Ohio Constitutions.

## III. First Assignment of Error – Other-Acts Evidence

{¶ 21} In his first assignment of error, Daylong argues the trial court erred in admitting other-acts evidence from the testimony of Daylong's former girlfriend. Daylong asserts the state offered this testimony to prove he acted in conformity with his bad character, an impermissible basis to admit evidence of other acts under Evid.R. 404(B).

{¶ 22} Evid.R. 404(B) states "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Generally, the admission or exclusion of evidence lies within the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, whether other-acts evidence is admissible pursuant to Evid.R. 404(B) is a question of law that we review de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22. If other-acts evidence is admissible for permissible purposes under Evid.R. 404(B), a trial court then has discretion whether to allow the other-acts evidence. *Id.*, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 17.

{¶ 23} Prior to trial, the state filed a notice of intention to present evidence relating to A.B., Daylong's former girlfriend, pursuant to Evid.R. 404(B) and R.C. 2945.59. The trial court initially ruled it would admit A.B.'s testimony with an appropriate limiting instruction. During trial, Daylong raised more specific objections to A.B.'s testimony causing the trial court to revise its ruling and exclude some of A.B.'s testimony. Daylong argues on appeal that the trial court erred in admitting the remaining portions of A.B.'s testimony, summarized above, asserting the state impermissibly used A.B.'s testimony to establish he acted in accordance with his bad character during his interactions with A.M.

{¶ 24} In two recent decisions, the Supreme Court of Ohio explained the proper framework for determining the admissibility of other-acts evidence under Evid.R. 404(B). *See State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441; *Hartman*, *supra*. In *Smith*, the Supreme Court stated:

> Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Other-acts evidence may, however, be admissible for another non-character-based purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." [*Hartman* at] ¶ 22.
>
> In *Hartman*, we provided a guide for courts to evaluate proposed other-acts evidence to determine whether the evidence connects to a permissible purpose without relying on any improper character inferences. The threshold question is whether the evidence is relevant. *Id.* at ¶ 24; Evid.R. 401; *see also* [*Williams* at] ¶ 20. As we explained in *Hartman*, the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. *Hartman* at ¶ 25; *see* 1A Wigmore, *Evidence*, Section 58.2, at 1212 (Tillers Rev.1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute. *Hartman* at ¶ 26-27; *see also Huddleston v. United States*, 485 U.S. 681, 686 (1988).
>
> Thus, courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case. If the evidence is not premised on improper character inferences and is probative of an issue in the case, the court must then consider whether the evidence's value "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A); *Hartman* at ¶ 29. Because other-acts evidence " 'almost always carries some risk that the jury will draw the forbidden propensity inference,' " courts should be vigilant in balancing the prejudicial impact of the evidence against its probative value. *Id.* at ¶ 33, quoting *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir.2014) (en banc).

*Smith* at ¶ 36-38.

{¶ 25} Daylong argues the other-acts evidence here was not offered for any legitimate, non-propensity purposes. The state responds, however, that A.B.'s testimony provided evidence of Daylong's modus operandi, and, as such, the trial court properly admitted the evidence as proof of Daylong's identity as the perpetrator. As the Supreme Court explained in *Hartman*, evidence of the defendant's modus operandi or "behavioral fingerprint" is inadmissible unless the question of the perpetrator's identity is an issue at trial. *Hartman* at ¶ 36-39. " 'Modus operandi' literally means method of working," and "is evidence of signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.' " *Hartman* at ¶ 37, citing *People v. Barbour*, 106 Ill.App.3d 993, 1982 Ill. App. LEXIS 1933, 999 (May 25, 1982), and quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019). Where identity is an issue, modus operandi evidence "is relevant to prove identity," as " '[e]vidence that the defendant had committed uncharged crimes with the same peculiar modus tends to identify the defendant as the perpetrator of the charged crime.' " *Hartman* at ¶ 37, quoting 1 Imwinkelried et al., *Courtroom Criminal Evidence*, at Section 907. Thus, for other-acts evidence to be admissible on the question of identity, "both the other-acts evidence and the charged crime must involve the same distinctive, one-of-a-kind modus." (Internal quotations omitted.) *Hartman* at ¶ 37. Moreover, "[s]light differences between the current and other acts will not affect the admissibility of the other-acts evidence as long as it establishes 'a modus operandi identifiable with the defendant.' " *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 119, quoting *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994).

{¶ 26} Here, the state charged Daylong with assault, attempted burglary, attempted trespass into a habitation, disrupting public services, menacing by stalking, and violating a protection order. Daylong asserts his identity as the perpetrator was not at issue; instead, Daylong maintains his defense at trial was that A.M. was not credible and that none of the events happened. Though Daylong did present an argument that the events did not actually happen, a review of the record indicates Daylong did not present that defense at the exclusion of all others. Rather, Daylong made more nuanced arguments throughout trial and on appeal related to each of the six specific charges.

{¶ 27} A.M. testified at trial that she did not see Daylong attempting to get into her residence or physically tampering with her electrical box. Daylong, in turn, argued at trial

and on appeal that there were no eyewitnesses linking him to those incidents and that the state's GPS evidence did not sufficiently place him near the victim's residence during the pertinent time frame. We construe these circumstances as raising a legitimate dispute about the perpetrator's identity for the charges of attempted burglary, attempted trespass, and disrupting public services. Moreover, A.B.'s testimony tended to show Daylong utilized "the same peculiar modus" in his conduct with A.B. and with the charged conduct here, establishing the unique methods Daylong used to harass a former girlfriend when the relationship terminates. *Hartman* at ¶ 37. Accordingly, we conclude the trial court did not err in finding A.B.'s testimony was admissible as other-acts evidence of modus operandi on the issue of identity.

{¶ 28} Because there was a legitimate dispute about the perpetrator's identity and the evidence was admissible for that purpose, the court must then weigh the probative value of the other-acts evidence against the dangers of unfair prejudice and jury confusion. *Smith* at ¶ 50; Evid.R. 403(A). Thus, the issue resolves to whether the trial court abused its discretion in making its Evid.R. 403(A) determination. *Smith* at ¶ 50, citing *Hartman* at ¶ 30. In order for evidence to be deemed inadmissible pursuant to Evid.R. 403(A), the probative value must be minimal and the prejudicial effect must be great. *State v. Hicks*, 10th Dist. No. 18AP-883, 2020-Ohio-548, ¶ 21, citing *State v. Shipley*, 10th Dist. No. 12AP-948, 2013-Ohio-4055, ¶ 61, citing *State v. Morales*, 32 Ohio St.3d 252, 258 (1987).

{¶ 29} Here, Daylong argued there was neither eyewitness nor physical evidence connecting him to three of the six charges. The other-acts evidence, therefore, was highly probative of Daylong's identity. *See Smith* at ¶ 50 (" '[a]s the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases' ") (emphasis sic), quoting *Hartman* at ¶ 31. Though we are mindful that the same factual dispute of the question of identity did not apply to the charges of assault, menacing by stalking, and violating a protection order, it was for the trial court to consider the overall probative value of the evidence in light of the potential for any such unfair prejudice. Daylong did not argue that the evidence should be admissible to prove identity only for certain charges but instead sought exclusion of the evidence in its entirety. *See State v. Ferguson*, 10th Dist. No. 07AP-999, 2008-Ohio-6677, ¶ 60 (noting Evid.R. 105 requires a

party to request a limiting instruction when evidence is admissible for one purpose but not another, and a trial court does not err in failing to provide a limiting instruction sua sponte); *Hicks* at ¶ 22 ("[a]ppellant did not object to the limiting instructions given by the trial court, and he has not alleged error in regard to the substance of [the limiting instructions] in this appeal").

{¶ 30} Moreover, we note that the trial court did provide a limiting instruction admonishing the jury not to consider the other-acts evidence as proof of Daylong's character.  A jury is presumed to follow the instructions of the court, including limiting instructions.  *Hicks* at ¶ 23, citing *Shipley* at ¶ 62. The limiting instruction provided here prevented any danger that the jury would unfairly consider the other-acts evidence as proof of Daylong's bad character or that he acted in accordance therewith.  *Hicks* at ¶ 22-23. Nothing in the record supports a conclusion that the jury's verdict resulted from improper consideration of the other-acts evidence.  Given the relevance and probative nature of the other-acts evidence here, and in consideration of the trial court's limiting instruction, we find no unfair prejudice arising from A.B.'s testimony.  Accordingly, the trial court did not abuse its discretion in admitting the other-acts evidence.

{¶ 31}  For these reasons, we overrule Daylong's first assignment of error.

## IV.  Second Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 32}  In his second assignment of error, Daylong argues there was insufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence.

### A.  Sufficiency of the Evidence

{¶ 33}  Whether there is legally sufficient evidence to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy. *Id.*  The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.  *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 34} The jury convicted Daylong of one count each of assault, attempted burglary, attempted trespass into a habitation, disrupting public services, menacing by stalking, and violating a protection order. We must examine each count to determine whether the state presented sufficient evidence to prove the essential elements of each count beyond a reasonable doubt.

### 1. Assault

{¶ 35} The jury found Daylong guilty of assault in violation of R.C. 2903.13. Pursuant to R.C. 2903.13(A), "[n]o person shall knowingly cause or attempt to cause physical harm to another." " 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration.' " R.C. 2901.01(A)(3). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime. *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-4075, ¶ 22. Culpable mental states are frequently demonstrated through circumstantial evidence. *Id.*

{¶ 36} The assault charge related to Daylong's interaction with A.M. on September 17, 2018 at her apartment. A.M. testified that Daylong grabbed her hand and squeezed it with such force that she feared her bones would break. When A.M. told Daylong that he was hurting her, she said he grabbed her other arm and pushed her against the door. She additionally testified that, the next day, she noticed bruises on her arm and a scrape on her back from the altercation. Though Daylong asserts A.M.'s testimony was not credible, " 'in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' " *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, ¶ 38, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4. Construing A.M.'s testimony in a light most favorable to the state, a rational jury could find Daylong knowingly caused A.M. physical harm. Thus, sufficient evidence supports Daylong's conviction of assault.

## 2. Attempted Burglary and Attempted Trespass in a Habitation

{¶ 37} The jury found Daylong guilty of attempted burglary, in violation of R.C. 2923.02 as it relates to R.C. 2911.12. Additionally, the jury found Daylong guilty of attempted trespass in a habitation, in violation of R.C. 2923.02 as it relates to R.C. 2911.12. R.C. 2911.12(A)(2) states "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." Further, pursuant to R.C. 2911.12(B), "[n]o person, by force, stealth, or deception, shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." A person criminally trespasses when he or she "knowingly enter[s] or remain[s] on the land or premises of another * * * without privilege to do so." R.C. 2911.21(A)(1). Privilege is "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of * * * [a] relationship." R.C. 2901.01(A)(12).

{¶ 38} R.C. 2923.02(A) defines attempt as "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." Further, the Supreme Court of Ohio has defined "criminal attempt" as " 'an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime.' A 'substantial step' requires conduct that is 'strongly corroborative of the actor's criminal purpose.' " *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 101, quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus.

{¶ 39} Thus, under the pertinent statutes, the state was not required to prove Daylong was successful in entering A.M.'s home in order to establish attempted burglary and attempted trespass in a habitation. Instead, the state was required to prove Daylong knowingly engaged in conduct that, if successful, would have constituted burglary pursuant to R.C. 2911.12(A)(2) and trespass in a habitation pursuant to R.C. 2911.12(B).

{¶ 40} Daylong argues the state failed to prove he was at A.M.'s apartment during the pertinent time frame such that he could have committed the offenses of attempted burglary and attempted trespass in a habitation. At trial, A.M. testified that during the early morning hours of September 22, 2018, she awoke to the sound of her doorknob wiggling and saw her deadbolt rattling. When she looked outside, A.M. said she saw the silhouette of a person with a distinctive gait and wearing a hat, and the person was pacing back and forth. A.M. further testified the distinctive gait led her to conclude the person was Daylong. Though Daylong argues this evidence was insufficient because neither another witness nor the state's GPS evidence corroborated A.M.'s version of events, we are mindful that, in a sufficiency of the evidence review, "[a] victim's testimony, alone, is sufficient to support a conviction." *State v. Abdullahi*, 10th Dist. No. 18AP-222, 2018-Ohio-5146, ¶ 34, citing *State v. W.J.*, 10th Dist. No. 14AP-457, 2015-Ohio-2353, ¶ 35, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53. Instead, from A.M.'s testimony, a jury could reasonably conclude that it was Daylong who attempted, through force, to trespass into A.M.'s apartment with the purpose to commit a criminal offense. *See State v. Szykulski*, 10th Dist. No. 19AP-639, 2021-Ohio-2733, ¶ 20 (victim's testimony was sufficient evidence to identify the defendant as the perpetrator through circumstantial evidence even where the victim did not personally witness the defendant commit the offenses). Accordingly, sufficient evidence supported Daylong's convictions of attempted burglary and attempted trespass in a habitation.

### 3. Disrupting Public Services

{¶ 41} The jury found Daylong guilty of disrupting public services. Pursuant to R.C. 2909.04(A)(2), "[n]o person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [i]nterrupt or impair * * * power, or other utility service to the public." Daylong argues the state presented insufficient evidence that he committed the offense because no one witnessed him tampering with the electrical box for A.M.'s apartment. Stated another way, Daylong's argument is that there was insufficient evidence to support this conviction because the state relied on circumstantial, rather than direct, evidence.

{¶ 42} "Circumstantial evidence is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common

experience of mankind.' " (Internal quotations omitted.) *State v. Robinson*, 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20, quoting *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has the same probative value as direct evidence. *Robinson* at ¶ 20; *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 120. " '[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *Robinson* at ¶ 20, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990).

{¶ 43} At trial, both A.M. and Brodbeck testified that the power to A.M.'s apartment went out on September 23, 2018. A.M. said that when she looked outside, all other apartments in the complex still had power. When A.M. and Brodbeck went outside the apartment, they saw Daylong looking at Brodbeck's car, and both A.M. and Brodbeck testified that Daylong ran away when Brodbeck confronted him. The police officers responding to the scene saw Daylong walking near the apartment but said he walked away "aggressively" when they first yelled for him to stop (Tr. Vol. 3 at 391.) When the officers eventually caught up with him, the officers said Daylong was sweating profusely and had defecated in his pants. *See, e.g., State v. Henry*, 10th Dist. No. 04AP-1061, 2005-Ohio-3931, ¶ 39-44 (a defendant's flight from the scene and nervous behavior are admissible as evidence of consciousness of guilt). Additionally, the officers testified that the electrical box to A.M.'s apartment showed signs of tampering. Construing this evidence in a light most favorable to the state, a rational jury could find Daylong knowingly tampered with the electrical box to A.M.'s apartment with the purpose of interrupting or impairing the power to her apartment. Thus, the state presented sufficient evidence to support Daylong's conviction of disrupting public services.[1]

### 4. Menacing by Stalking

{¶ 44} The jury found Daylong guilty of menacing by stalking. R.C. 2903.211 defines "menacing by stalking" as "engaging in a pattern of conduct" which will "knowingly cause another person to believe that the offender will cause physical harm to the other person

---

[1] We note that Daylong additionally argues under this assignment of error that the state failed to prove the "public" element of R.C. 2909.04(A)(2), arguing disrupting power to only a single residence is insufficient to prove disruption of public services. This argument is the subject of Daylong's third assignment of error, and we address it in full in Section V, *infra*.

* * * or cause mental distress to the other person."  R.C. 2903.211(A)(1).  A "pattern of conduct" is "two or more actions or incidents closely related in time."  R.C. 2903.211(D)(1).

{¶ 45}  A.M. testified that between September 21 and September 24, 2018, Daylong repeatedly called her and sent her text messages, appeared at her workplace, appeared at restaurants where he knew she would be, attempted to break into her apartment while she slept, left letters at her apartment door, cut off her electricity, and appeared at the courthouse while A.M. was there seeking a protection order against Daylong.  Further, A.M. testified she was in anguish over Daylong's behavior and feared he would harm her. Daylong argues these incidents were not menacing behavior and, thus, could not constitute a pattern of conduct sufficient to find him guilty of menacing by stalking.  However, in determining whether a defendant's conduct constitutes a pattern of conduct, a court must take everything into consideration, "even if some of the person's actions may not, in isolation, seem particularly threatening."  (Internal quotations omitted.)  *State v. Dillard*, 10th Dist. No. 18AP-178, 2018-Ohio-4842, ¶ 17.  The evidence here is sufficient for a rational jury to conclude Daylong engaged in a pattern of conduct that would knowingly cause A.M. to believe he would cause physical harm or mental distress to her.  Thus, sufficient evidence supports Daylong's conviction of menacing by stalking.

### 5.  Violating a Protection Order

{¶ 46}  The jury found Daylong guilty of violating a protection order.  Pursuant to R.C. 2919.27, "[n]o person shall recklessly violate the terms of * * * [a] protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code."  R.C. 2919.27(A)(1).  *See also State v. Partlow*, 10th Dist. No. 12AP-459, 2013-Ohio-2771, ¶ 19.  Further, "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist."  R.C. 2901.22(C).

{¶ 47}  A.M. had a valid protection order issued pursuant to R.C. 3113.31.  The terms of the protection order against Daylong prohibited him from being within 500 feet of A.M. A.M. testified that on October 1, 2018, after Daylong had been served with the protection

order, she was at a Rooster's restaurant and saw Daylong in the parking lot. She said Daylong appeared to leave the parking lot only to return a short time later, and she further testified she saw Daylong get out of his van and walk toward the restaurant. Brodbeck, who was with A.M. at the restaurant, testified that Daylong did not return to his van until Brodbeck walked outside to confront him. The distance between Daylong's van and where A.M. was seated inside the restaurant was less than 300 feet. Daylong also admitted to a detective that he knew A.M. would be at the restaurant from a text message meant for her children that A.M. unintentionally sent to Daylong. From this evidence, a rational jury could conclude Daylong recklessly violated the terms of the protection order by coming within 500 feet of her. Therefore, sufficient evidence supports Daylong's conviction of violating a protection order.

### B. Manifest Weight of the Evidence

{¶ 48} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 49} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the

manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 50} Daylong argues his convictions are against the manifest weight of the evidence because the jury clearly lost its way in believing A.M.'s testimony. However, a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version of events. *Szykulski* at ¶ 25, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. As noted above, the trier of fact remains free to believe "all, part, or none of a witness's testimony." *Raver* at ¶ 21.

{¶ 51} Daylong first argues A.M.'s testimony lacks credibility because she admitted to tampering with his prescription Adderall and received immunity from the state related to any criminal charges that could stem from that conduct. It is within the province of the jury, however, to believe a witness's testimony in spite of admitted involvement with criminal conduct, plea agreements, and/or immunity agreements with the state. *State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218, ¶ 74, citing *State v. Connally*, 16AP-53, 2016-Ohio-7573, ¶ 41, citing *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18. Defense counsel had ample opportunity on cross-examination to highlight A.M.'s immunity agreement and admission to tampering with Daylong's medication. Her testimony was not "so incredible as to render appellant's convictions against the manifest weight of the evidence." *Berry* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 35.

{¶ 52} Additionally, Daylong asserts A.M. had reason to fabricate stories about him, attempting to depict A.M. as upset that the relationship ended and seeking to punish Daylong by providing false testimony about his conduct. Again, however, defense counsel was able to cross-examine A.M. about her attempted reconciliations with Daylong, and A.M. testified that despite prior attempts to make the relationship work, she unequivocally ended the relationship on September 21, 2018. Despite Daylong's suggestion that A.M. had a motive to concoct a false story, we find, after reviewing the record in its entirety, that the jury did not clearly lose its way in finding A.M.'s testimony to be credible.

{¶ 53} Moreover, to the extent Daylong argues his convictions are against the manifest weight of the evidence due to the lack of physical or forensic evidence connecting him to the offenses, this court has repeatedly stated that  " '[a] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence.' "  *State v. Murray*, 10th Dist. No. 16AP-16, 2017-Ohio-949, ¶ 38, quoting *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12.  " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other [type of] physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence).  As we stated above, A.M. provided credible testimony about Daylong's conduct from September 17 to October 1, 2018.

{¶ 54} Thus, in light of the evidence discussed above, as well as the record in its entirety we do not find the jury clearly lost its way in concluding the state proved Daylong committed each of the six offenses.  We conclude, therefore, that the manifest weight of the evidence supports Daylong's convictions of assault, attempted burglary, attempted trespass in a habitation, disrupting public services, menacing by stalking, and violating a protection order.   Having additionally concluded there was sufficient evidence to sustain these convictions, we overrule Daylong's second assignment of error.

## V.  Third Assignment of Error – Limitations on Closing Arguments and Jury Instructions

{¶ 55} In his third assignment of error, Daylong argues the trial court erred in limiting his counsel's closing arguments related to disrupting public services and in refusing to provide the jury with his requested instruction on disrupting public services.

### A.  Jury Instructions

{¶ 56} In instructing the jury, a trial court "must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus.  A criminal defendant is entitled only to have the law stated correctly by the trial court but "not to have his proposed jury instructions

presented to the jury." *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 25, citing *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 48. Where a requested jury instruction contains a correct statement of the law as applied to the facts of the case, the trial court should generally give such an instruction. *Id.*, citing *Hubbard* at ¶ 48.

{¶ 57} "The trial court has broad discretion in fashioning the jury instructions as long as it presents 'a correct, pertinent statement of the law that is appropriate to the facts.' " *State v. Stevenson*, 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 16, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46. Generally, an appellate court reviews a trial court's jury instructions for an abuse of discretion. *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 33, citing *State v. Grover*, 10th Dist. No. 05AP-1034, 2006-Ohio-4338, ¶ 22, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). However, when a jury instruction contains an incorrect statement of the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21. "Thus, [i]n examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." (Internal quotations omitted.) *State v. Rutledge*, 10th Dist. No. 17AP-590, 2019-Ohio-3460, ¶ 31.

{¶ 58} Daylong argues the trial court erred in instructing the jury on the charge of disrupting public services. At trial, the court instructed the jury as follows:

> Before you can find the Defendant guilty of Disrupting Public Services, you must find beyond a reasonable doubt that on or about the 23rd day of September, 2018, in Franklin County, Ohio, the Defendant did knowingly, by damaging or tampering with any property, interrupt or impair electrical power to the public, to-wit: [A.M.'s] residence.

(Tr. Vol. 4 at 711.) Daylong asserts the trial court's instruction was erroneous because a single residence cannot constitute "the public" within the meaning of R.C. 2909.04.

{¶ 59} Daylong's argument presents a question of statutory interpretation, a question of law subject to de novo review on appeal. *State v. Banks*, 10th Dist. No. 11AP-69, 2011-Ohio-4252, ¶ 13. A court's duty is to give effect to the words used in a statute, not

to delete or insert words. *State v. Maxwell*, 95 Ohio St.3d 254, 2002-Ohio-2121, ¶ 10. "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." *Sears v. Weimer*, 143 Ohio St. 312 (1944), paragraph five of the syllabus. "Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed. Otherwise, allegations of ambiguity become self-fulfilling." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, ¶ 11.

{¶ 60} Ambiguity exists only if the language of a statute is susceptible to more than one reasonable interpretation. *See, e.g., State ex rel. Toledo Edison Co. v. Clyde*, 76 Ohio St.3d 508, 513 (1996). If a statute is ambiguous, R.C. 1.49 provides that a court may consider "other matters," such as the object sought to be attained and the consequences of a particular construction, to determine the intent of the legislature. *See State v. Polus*, 145 Ohio St.3d 266, 2016-Ohio-655, ¶ 7. In the criminal context, the rule of lenity provides that statutes defining offenses or penalties shall be strictly construed against the state and liberally construed in favor of the accused. *See* R.C. 2901.04(A). The "touchstone" of the rule of lenity is "statutory ambiguity." *Lewis v. United States*, 445 U.S. 55, 65 (1980). If a statute is not ambiguous, the rule of lenity does not apply. *United States v. Johnson*, 529 U.S. 53, 59 (2000).

{¶ 61} As noted above, R.C. 2909.04(A)(2) provides "[n]o person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [i]nterrupt or impair * * * water supply, gas, power, or other utility service to the public." Daylong asserts that because R.C. 2909.04 does not define the term "public," the statute is ambiguous and thus subject to the rule of lenity. Thus, Daylong would have us interpret the statute to mean an offender cannot be guilty of disrupting public services unless his conduct causes an interruption of utility services to the public at large.

{¶ 62} We note, as Daylong does, that R.C. 2909.04 does not define the term "public." However, in looking at the plain language of the statute, the phrase "to the public" is a prepositional phrase modifying "utility service." Thus, the use of the word public in the statute describes the type of service the statute protects rather than, as Daylong asserts, the number of victims it must impact. Accordingly, Daylong's interpretation of R.C.

2909.04(A)(2) is inconsistent with the plain language of the statute. *See State v. Glass,* 10th Dist. No. 11AP-890, 2012-Ohio-2993, ¶ 35 (finding sufficient evidence to support a conviction for disrupting public services where the defendant removed the electric meter from a single residence, causing the electrical services to the victim's home to be interrupted); *see also State v. Brown*, 97 Ohio App.3d 293, 301-02 (8th Dist.1994) (holding R.C. 2909.04(A)(2) does not require a showing that the defendant "completely deprived each and every member of the entire community" of the utility service; rather, interrupting or impairing service "at a single location" is sufficient to show a violation of R.C. 2909.04(A)(2)).  As there is no ambiguity, neither the rule of lenity nor any other rule of statutory construction applies. *Columbus v. Mitchell*, 10th Dist. No. 16AP-322, 2016-Ohio-7873, ¶ 9.

{¶ 63} Having determined Daylong's proposed interpretation of R.C. 2909.04(A)(2) is inconsistent with the plain language of the statute, we find the trial court's jury instruction on the charge of disrupting public services contained a correct statement of law, and thus the trial court did not err in instructing the jury.

### B.  Limitations on Closing Arguments

{¶ 64} Daylong additionally argues under this assignment of error that the trial court erred in refusing to allow him to argue, during closing arguments, that the state could not prove a violation of disrupting public services where the interference with electrical power occurred at only one residence.

{¶ 65} During the trial, Daylong filed a motion to dismiss pursuant to Crim.R. 29 arguing the state could not prove he disrupted electric service "to the public." (Mar. 5, 2019 Mot. to Dismiss.)  Daylong renewed this argument at trial.  After considering the motion, the trial court denied Daylong's motion and, over Daylong's objection, refused to allow Daylong's counsel to argue to the jury during closing arguments whether A.M.'s single residence constituted "the public" within the meaning of the statute.  Daylong argues the trial court erred in both its denial of his Crim.R. 29 motion and its ruling that Daylong could not argue the issue to the jury.

{¶ 66} As we noted in our discussion of the jury instructions, Daylong's argument about the meaning of the phrase "to the public" presents a question of statutory interpretation that this court reviews de novo. *Banks* at ¶ 13.  Having concluded that

Daylong's proposed interpretation of the statute is inconsistent with the plain language of the statute, the trial court did not err in denying Daylong's Crim.R. 29 motion or in preventing him from arguing the statute's meaning to the jury during closing arguments. We overrule Daylong's third assignment of error.

## VI. Fourth Assignment of Error – Evidence of Prior Conviction

{¶ 67} In his fourth and final assignment of error, Daylong argues the trial court erred in admitting evidence of his prior criminal conviction. More specifically, Daylong asserts the trial court erred when it allowed A.M. to testify that Daylong had told her he was convicted of breaking and entering against an ex-girlfriend and when it allowed the state to play one of A.M.'s 911 calls mentioning the prior conviction. Daylong argues the state used this evidence as improper propensity evidence under Evid.R. 404(B), thereby depriving him of a fair trial.

{¶ 68} In our resolution of Daylong's first assignment of error, we noted that, when admissible, a trial court has discretion whether to admit other-acts evidence. *Hartman* at ¶ 22. Here, Daylong concedes his counsel did not object to the evidence of his prior conviction at trial. Thus, Daylong has waived all but plain error. *State v. C.W.*, 10th Dist. No. 15AP-1024, 2018-Ohio-1479, ¶ 27 (failure to object to other-acts evidence waives all but plain error), citing *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 84. An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 69} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A court will reverse on plain error only upon a showing that the outcome " 'clearly would have been different absent the error.' " *State v. Petty*, 10th Dist. No. 11AP-716, 2012-Ohio-2989, ¶ 15, quoting *State v. Zachery*, 10th Dist. No. 08AP-451, 2009-Ohio-1180, ¶ 8.

{¶ 70} Here, Daylong is unable to demonstrate plain error from the admission of the evidence of his prior criminal conviction. As the state notes, the evidence related to A.M.'s

state of mind during her 911 call and the degree to which A.M. feared Daylong. The evidence was not admitted to show that Daylong acted in conformity with his bad character. Furthermore, even if we were to conclude the evidence was not admissible under Evid.R. 404(B), Daylong does not demonstrate that the outcome of the trial clearly would have been different without this testimony. We are mindful that the trial court provided a limiting instruction related to the other-acts evidence from A.B.'s testimony, and A.B. testified about the same breaking-and-entering that A.M. referred to as Daylong's prior criminal conduct. *See State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 24 (noting a limiting instruction lessens the prejudicial effect of other-acts evidence). Furthermore, as we noted in our resolution of Daylong's first assignment of error, there was ample other evidence at trial overwhelmingly supporting Daylong's convictions. Thus, the admission of the evidence of Daylong's prior criminal conviction did not affect the outcome of the trial and, therefore, does not constitute plain error. *See Columbus v. Burgess*, 10th Dist. No. 19AP-392, 2021 Ohio App. LEXIS 2154 (June 29, 2021) (no plain error in admitting police officer's testimony concerning appellant's prior arrest as it did not affect the outcome of the trial), citing *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 245 (no plain error in admission of other-acts evidence due to overwhelming evidence of guilt).

{¶ 71} Because the admission of the other-acts evidence of Daylong's prior criminal conviction was not plain error, we overrule Daylong's fourth and final assignment of error.

**VII. Disposition**

{¶ 72} Based on the foregoing reasons, the trial court did not err in the admission of other-acts evidence, sufficient evidence and the manifest weight of the evidence supports Daylong's convictions, the trial court did not err in instructing the jury or in preventing Daylong from arguing to the jury the meaning of the term "public" as used in R.C. 2909.04(A)(2), and the admission of the evidence of Daylong's prior criminal conviction did not constitute plain error. Having overruled Daylong's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, J., concurs.
BEATTY BLUNT, J., dissents.

BEATTY BLUNT, J., dissenting.

{¶ **73**} Because I would sustain Daylong's first assignment of error and remand the case for a new trial in compliance with the requirements of Evid.R. 404, I respectfully dissent.

{¶ **74**} The majority has not fully considered the effect that *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, and *State v. Smith,* 162 Ohio St.3d 353, 2020-Ohio-4441, have on the rule, and therefore on this case. Among other holdings, *Hartman* and *Smith* "clarified" the use of other-acts evidence under Evid.R. 404(B), and both limited the number of cases in which such evidence may be admitted and restricted the use of such evidence in cases where it is admitted. The Supreme Court of Ohio concluded that other-acts evidence of the defendant's modus operandi (or "behavioral fingerprint") is inadmissible unless the identity of the defendant was material to the dispute before the court. *Hartman* at ¶ 36-39 ("[E]ven if B.T.'s testimony could have been labeled modus operandi evidence, it still would not have been admissible because identity evidence was not an issue in the case.") *See also Smith* at ¶ 42 (Testimony regarding defendant's molestation of his daughter 30 years earlier was not admissible in prosecution for molestation of his granddaughter because defendant's identity was not a fact in dispute.).

{¶ **75**} The majority holds that A.B.'s testimony was admissible because there was a "legitimate dispute about the perpetrator's identity for the charges of attempted burglary, attempted trespass, and disrupting public services." Majority Decision at ¶ 27. It is true that in past cases, the concept of "identity" has been construed broadly enough to cover the admission of A.B.'s testimony. But under *Hartman* and *Smith*, the facts of the criminal acts being tried must first present a legitimate question as to the identity of the person who committed the alleged offenses, and second, the facts of both the prior act and the act must contain a "behavioral fingerprint" or specific modus operandi that suggests that both acts were committed by the same perpetrator. *See Hartman* at ¶ 36-39 and *Smith* at ¶ 42.

{¶ **76**} But Daylong's identity was never truly at issue in this case—if these offenses occurred, Daylong was the only suspect. He did not present any evidence or make any suggestion at any point that the crimes were committed by someone else. Instead, he consistently argued at trial that A.M. was lying and that those crimes did not occur at all. For example, A.M. testified that during the incident that formed the basis of the attempted

trespass and attempted burglary charges, she did not see Daylong's face but identified him by his hat and his unusual gait. And while it is true that a small part of A.B.'s testimony confirmed Daylong had an unusual walk, Daylong's defense was not that he did not have an odd way of walking and therefore it was someone else who tried to get into A.M.'s house.

{¶ 77} Cross-examination of A.M. barely addressed the facts of the alleged incidents and instead focused on attacking A.M.'s credibility—by confronting her with her text messages to Daylong and others and her admissions that she had tampered with Daylong's prescription pills before returning them to him, something she did not reveal to the police when they questioned her about it. *See* March 5, 2019 Tr. Vol. II. at 230-92 (cross-examination of A.M.). Daylong's counsel specifically argued to the jury that "the evidence has demonstrated that [A.M.] is a liar," (Mar. 7, 2019 Tr. Vol IV. at 664) and argued that while the state had argued "that I'm trying to argue with you about identity. I suggest to you that *no one else did the things we're talking about.* What I suggest to you based on [A.M.'s] testimony is that they didn't happen." (Emphasis added.) *Id.* at 665. Throughout, counsel consistently argued that "*it's not identity.* Didn't happen. The State cannot prove to you beyond a reasonable doubt *that it happened.*" (Emphasis added.) *Id.* at 668.

{¶ 78} The state argued that A.B.'s testimony "shows [Daylong's] identity, *which is something we have to prove in each offense.* It shows that this was committed by him versus somebody else." (Emphasis added.) *Id.* at 686. But this argument—adopted by the majority in its holding—proves far too much. Given that no other possible suspect was ever identified nor put forward by either the state or the defense, the conclusion that identity is at issue on these facts has the effect of making identity a disputed issue in every case, a position that *Hartman* and *Smith* directly reject. The majority suggests that Daylong "made more nuanced" arguments throughout trial and on appeal about the identity of the perpetrator of the alleged offenses. Majority Decision at ¶ 26. The majority points to the fact that Daylong argued that there were "no eyewitnesses" to the alleged tampering with A.M.'s electrical box or the alleged attempted forced entry into her home. *Id.* at ¶ 27. But Daylong did not testify—his consistent position at trial and on appeal was that A.M.'s allegations and testimony were false. The arguments that the majority cites are completely consistent with that defense, and the majority cannot point to any specific statements from the trial transcript to support its view.

{¶ 79} Moreover, the state made no effort to restrict the use of A.B.'s testimony to the asserted permissible purpose of identifying Daylong as the perpetrator. Indeed, in its brief to this court, the state described commonalities between the acts committed against A.B. and those for which Daylong was on trial and argued: "[c]all it a modus operandi. Call it a behavioral fingerprint. Or call it a scheme, plan, or system. What matters is that [A.M.]'s break-up with Daylong shares many of the same identifiable characteristics as those employed to stalk [A.B.]." (Appellee's Brief at 32-33.) Clearly, the state did not present the "other-act" evidence challenged under Evid.R. 404(B) to demonstrate Daylong's style of walking and therefore his identity. Rather, it candidly admits, it presented A.B.'s testimony because it showed that "Daylong has a distinct, identifiable *method of stalking ex-girlfriends* * * *." (Emphasis added.) *Id.* at 32. As the Supreme Court has already determined in *Hartman* and *Smith*, on facts where identity is not truly in question this is a forbidden "propensity" argument. *See Smith* at ¶ 36-38 (quoting Evid.R. 403(A) and *Hartman* at ¶ 29-33). Insofar as Daylong's actions against A.B. are related to the crimes against A.M., they do not establish Daylong's identity as the perpetrator—they only support the forbidden logical chain that Daylong has a propensity to commit stalking crimes and therefore actually committed those crimes against A.M. The majority opinion wholly fails to address this problem.

{¶ 80} The majority also relies heavily upon the fact that the court provided a pattern limiting instruction to the jury regarding the use of A.B.'s testimony. Majority Decision at ¶ 30. But the majority ignores the *Hartman* court's observation that the standard limiting instruction for the use of other-act evidence is "only of limited value to the jury * * * [because] the analytical distinctions between the different types of evidence that may be admitted under Evid.R. 404(B) can be difficult." *Hartman* at ¶ 69. The *Hartman* court held that the standard instruction "imparts nothing meaningful and is akin to telling the jurors that the evidence may be considered for any purpose." *Id.* Accordingly, "the instruction should be tailored to the facts of the case":

> [I]t is not realistic to simply list all the permissible uses and expect jurors to go through each one and determine the use for which the evidence is properly considered * * * the instruction should be tailored to the facts of the case. The boilerplate language contained in the Ohio Jury Instructions addressing

> other-acts evidence is merely a template * * *. Rather than recounting to the jury every purpose listed in Evid.R. 404(B), our pattern jury instructions direct trial courts to state the specific purpose for which the other-acts evidence is being admitted in that case."

*Hartman* at ¶ 69-70. The *Hartman* court specifically held that "[g]oing forward, courts should explain, in plain language, the purposes for which the other acts may and may not be considered." *Id.* at ¶ 71. The limiting instruction provided in this case is completely insufficient under these standards, as it merely recapitulates the pattern jury instruction criticized in *Hartman*.[2]

{¶ 81} In order to overrule Daylong's first assignment of error, the majority concludes that (1) identity was really at issue in this case; (2) A.B.'s testimony establishes a "behavioral fingerprint" that is clearly present in the case for which Daylong was on trial; and (3) A.B.'s evidence was more than simply a justification for concluding that Daylong had a propensity to commit the offenses with which he was charged and so he must therefore have committed those offenses. *See generally Hartman* and *Smith*. Even assuming for argument that the court's boilerplate limiting instruction was sufficient, and

---

[2] In conjunction with the admission of A.B's testimony, the trial court gave the standard limiting instructions to the jury regarding the use of "other acts" testimony and the limited purposes for which it can be used:

> Evidence was received about the commission of crimes, wrongs, and acts other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the defendant in order to show that he acted in conformity with that character.
>
> If you find that the evidence of other crimes, wrongs, and acts is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the Defendant's motive, opportunity, intent, preparation, and/or plan to commit the offenses charged in this trial, his knowledge of circumstances surrounding the offenses charged in this trial, the identity of the person who committed the offenses in this trial, and the absence of mistake or accident. That evidence cannot be considered for any other purpose.
>
> Let me caution you that the evidence of the scheme, plan, or system is only one of the things you are to consider in determining identity. The state must prove identity beyond a reasonable doubt. If you find that the Defendant committed the other act, you may not presume that he committed the acts charged. You may, however, consider the other act along with all other evidence in deciding whether the State has proved beyond a reasonable doubt that the Defendant, rather than some other person, committed the offense charged. You may also decide that the State has failed to prove that a crime occurred at all.

(Mar. 7, 2019 Tr. Vol IV at 701-02.)

even assuming that Daylong's crimes against A.B. share a modus operandi with the actions for which he was tried in this case, none of the permissible purposes of other-acts evidence as described in Evid.R. 404 (B) were material to the state's case against Daylong.

{¶ 82} The majority's holding that Daylong's identity was a material issue at trial is at odds with *Hartman* and *Smith*, and the lack of material connection between A.B.'s testimony and the state's allegations in this case created the situation that Evid.R. 404(B) was crafted to avoid—the jury was left with the impermissible logical chain that Daylong had a propensity to commit the type of acts with which he was charged, and therefore did commit those acts. I accordingly dissent.

---