[Cite as *State v. Jamea*, 2022-Ohio-1647.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,                    :               No. 20AP-278
                                                (C.P.C. No. 19CR-2597)

v.                                               :

Abdulrahman A. Jamea,                            :               No. 20AP-279
                                                (C.P.C. No. 19CR-2860)

      Defendant-Appellant                    :

---

D E C I S I O N

Rendered on May 17, 2022

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes*.

---

APPEALS from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Abdulrahman A. Jamea, appeals the judgments of the Franklin County Court of Common Pleas, convicting him of eight counts of second-degree felony felonious assault with firearm specifications and imposing a sentence of incarceration. Two cases involving two separate events were consolidated for Jamea's trial, and Jamea was found guilty by a jury of all counts in each case. Twelve years of Jamea's sentence are composed of definite, mandatory and consecutive terms for firearm specifications, to be served prior to an aggregate indefinite sentence of 35 to 38.5 years for

the 8 counts of felonious assault.[1] Jamea was charged in 2 separate indictments of 4 counts each, which reflected 2 separate sets of events that occurred 15 days apart. In Franklin C.P. No. 19CR-2860, he was charged and convicted for shooting at 4 women in the parking lot of his Shanley Drive apartment complex on April 30, 2019, and in Franklin C.P. No. 19CR-2597, he was charged and convicted for shooting at 4 men at a Stonehenge Drive apartment complex on May 15, 2019.

{¶ 2} The events of April 30, 2019 were observed by Andrea Curtiss, who lived in the Shanley Drive apartment complex and worked remotely for the state of Connecticut. Ms. Curtiss had seen Jamea on at least two prior occasions, had at least one conversation with him, knew which apartment in the complex Jamea lived in, identified him as the shooter in a photo array six months after the shooting, and identified him again at trial. Ms. Curtiss worked from home and had a view of the parking lot where the shooting occurred from her desk. When she looked out the window that morning at around 9:30 a.m., she saw four women climbing in and out of one of the complex trash dumpsters, yelling at each other, picking out items of clothing, placing them into trash bags, and putting the bags into a car. She found this situation strange and became nervous, so she called 911 and reported the incident. But within a few moments after she hung up with emergency services for the first time, she witnessed Jamea approach the women and begin shooting at them:

> MS. CURTISS: And the next thing I know, I saw the defendant
> coming down the stairs, crossing through the grass right next
> to the trash can and by the bumper of his car, and he unloaded
> the entire clip directly at these girls.

---

[1]We note in passing that Mr. Jamea has not challenged either the computation or the constitutionality of his indefinite sentence, which was imposed pursuant to R.C. 2967.21, the "Reagan Tokes Law." *See*, *e.g.*, *State v. Maddox*, Slip Opinion No. 2022-Ohio-764.

> There's four girls in this car and they're - - he's just a matter of a few feet away.
>
> I got extremely scared. I dropped to the ground. I called 9 1 1 four times before I could get through because I was so upset.
>
> I saw him clear as day. All he had to do was turn and see me and shoot me.
>
> * * *
>
> I had never witnessed anything of that sort. You hear gunshots when you're outside, but you don't ever really see anything. And it's not like I live - - you know, it's not in the best neighborhood.
>
> But when he unloaded that entire clip, I saw him continue to shoot, realize the clip was empty. He casually turned around, got in his vehicle, backed out, and just drove away calmly. He wasn't frantic like, oh, my God, where's my keys? I got to get out of here.
>
> He just turned, and that bothered me so bad.
>
> * * *
>
> Because a normal person would be scared after they unloaded a clip at an entire - - at these girls and their car, and when he calmly - - it's like any normal person would be nervous like, oh my gosh, I got to get out of here. The cops are going to come. Blah, blah, blah.
>
> No, he just turned around got in his car and drove away like he was going to the grocery store. That bothered me a lot, and it scared me to death that he's going to, you know, come back and do this again.

(Mar. 10, 2020 Tr. Vol. 2 at 319-20.)  Both of Ms. Curtiss' 911 calls were played for the jury.

{¶ 3}  Luckily, none of the women were hit, although one suffered minor injuries from broken glass.  Three of the women testified at Jamea's trial and clarified the events leading up to the incident.  Apparently, the women had packed luggage for an upcoming trip, and had left the luggage in their car.  But the prior evening, they discovered that the luggage was missing.  Two of the women were friendly with Jamea's girlfriend Saham Khalif

and were familiar with Jamea. They suspected that Jamea or someone connected to him was responsible for the theft, and the four women went to the Shanley Drive complex to look for their luggage and clothing. When they discovered their clothing was in the dumpster, one of the women angrily phoned Khalif to complain about the situation. At around the same time, they saw Jamea approaching them, so they ran and got in their car just as Jamea began shooting at them. A police officer arrived on the scene shortly thereafter, presumably responding to Ms. Curtiss' 911 call. The victims were still on the scene and spoke to the officer, who testified that at least one of them identified the shooter as "Abdulrahman" but was unable to provide a last name. The victims also provided the officer a general description of the shooter that closely matched Jamea; one of them subsequently identified Jamea as the shooter from a photo lineup, and two of them identified him at trial.

{¶ 4} Fifteen days later, on May 15, 2019, there was a shootout at an apartment complex on Stonehenge Drive between Jamea and four other men. Three of the men involved in the shooting—Abdikhadir Abdi, Abdurahman Adan a/k/a "Top Mali," and Abdulbasid Maxanad—testified at Jamea's trial. Mr. Adan was seriously injured in the incident, having been shot on the left side of his head.

{¶ 5} Mr. Abdi testified that a car suddenly pulled up and at least one of the occupants began shooting at the four men, who were in and around Mr. Abdi's car. He testified that when the shooting started, he retrieved a gun from his glove compartment and returned fire, shooting the gun four times. The other men testified that they were both in the backseat of Mr. Abdi's car and did not see who was shooting or at what.

{¶ 6} None of the men were able to identify Jamea as being involved in the affray, but parts of the shootout were seen by witnesses, who also testified N.K., a twelve-year-old

boy playing with friends at the Stonehenge Drive complex. He testified that he saw a red Hyundai drive fast into the complex, driven by a woman with a male passenger. When the car stopped, the passenger got out, and there was shooting. N.K. fled and hid behind a building. He did not see who was doing the shooting, had never before seen the car, and had never before seen the male passenger. And Dacey Lamb, a resident of the complex, testified for Jamea. Ms. Lamb stated that she was inside her apartment watching television when she heard shots fired, and got to the window in time to see Mr. Abdi fire the last shot in the exchange from the parking lot area of the complex. She testified she recognized both Mr. Abdi and his car, because Mr. Abdi's car "was always there. They were the ones that would come into my building and smoke marijuana * * *. And I would ask them to leave." (Mar. 21, 2020 Tr. Vol. 4 at 802.

{¶ 7} Jamea was apprehended shortly after the shootout at a nearby Circle K gas station, along with his girlfriend. He had been shot in the back of his leg. Surveillance video from the Circle K shows a red Hyundai parking at one of the gas pumps, and Saham Khalif exiting the driver's side of the vehicle. She opens the trunk and walks behind the car, closes the trunk, walks and then runs towards the side of the building out of frame, all the while holding something in her hands that is covered by some piece of cloth. After several seconds she returns to frame, empty-handed, and runs back to the passenger side of the car. She returns to the driver's side, then again opens the trunk, and then walks towards the entrance to the main building and out of the camera frame. At the same time, the first police cruisers arrive on the scene, officers get out and approach the car, open the passenger door, and appear to begin a conversation with the passenger. Khalif returns to the frame, apparently from inside of the building just after the fourth squad car arrives, carrying what appear to be paper towels. She returns towards the car, and the video ends. A Columbus

Police Detective subsequently found a handgun under a milk crate on the side of the building where Khalif headed the first time she left the car.

{¶ 8} Jamea was interrogated by the police six days later, and the video was shown to the jury. During questioning, Jamea admitted that he was involved in the Stonehenge Drive shootout but maintained that he acted in self-defense. He forcefully encouraged investigators to review the apartment complex's security footage of the incident, which he argued would corroborate his story, but no such footage exists.

{¶ 9} The jury found Jamea guilty on all eight counts and attached firearm specifications, and these timely appeals followed. He asserts three assignments of error with the trial court's judgments:

> [I.] The verdicts regarding the May 15th shooting (Counts 5, 6, 7 and 8) are contrary to the manifest weight of the evidence.
>
> [II.] The trial court erred by trying the two indictments in a consolidated trial, over Mr. Jamea's objection.
>
> [III.] Mr. Jamea was deprived of effective assistance of counsel.

{¶ 10} In Jamea's first assignment or error, he challenges only his convictions related to the Stonehenge Drive shootout, arguing that his convictions were against the manifest weight of the evidence because he acted in self-defense. We observe that he has not challenged the sufficiency of the evidence against him, nor the allocation of the burden of proving self-defense, nor the instructions given to the jury regarding the state's burden in this case to disprove that appellant acted in self-defense.

{¶ 11} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio

St.3d 382, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 12} Furthermore, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Gullick*, 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 10, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996). "A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony." *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). A conviction is not against the manifest weight of the evidence simply because the jury believed the state's version of events over the appellant's version. *Gullick* at ¶ 11, citing *State v. Houston*, 10th Dist. No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds). Rather, a reviewing court must give great deference to the jury's determination of witness credibility. *Id.*, citing *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 19. This is so because the jury " ' "is best able to view the witnesses and

observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *State v. Huber*, 10th Dist. No. 18AP-668, 2019-Ohio-1862, ¶ 32, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 13} In following the court's instructions, the jury was free to either believe or disbelieve in whole or in part the evidence presented. Given that there was direct evidence presented to establish that Jamea was at fault in creating the affray on May 15, 2019, we cannot say that the jury clearly lost its way or created a manifest injustice by rejecting the version of evidence appellant presented in his interview with the police. Accordingly, Jamea's first assignment of error lacks merit and is overruled.

{¶ 14} As to the second assignment of error, there is no basis in the record that would allow this court to conclude that the trial court abused its discretion by denying appellant's motion for relief from joinder under Crim.R. 14. *See State v. Ford*, 158 Ohio St.3d 139, 158, 2019-Ohio-4539, ¶ 103-07. The state may negate claims of prejudicial joinder in two ways—either by establishing that "evidence of one offense would be admissible at a separate trial of the other offense as 'other acts' evidence under Evid.R. 404(B)," *State v. Gravely*, 188 Ohio App.3d 825, 838, 2010-Ohio-3379, ¶ 38, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, or "if the evidence of the offenses joined at trial is simple and direct, so that a jury is capable of segregating the proof required for each offense." *Gravely* at ¶ 38, citing *State v. Johnson,* 88 Ohio St.3d 95, 109 (2000). And the "two tests are disjunctive, so that the satisfaction of one negates a defendant's claim of prejudice without having to consider the other test." *Gravely* at ¶ 38. In short, "if the state can meet the joinder test, it need not meet the stricter 'other acts' test of Evid.R. 404(B)." *State v. Mills*, 62 Ohio St.3d 357, 362 (1992).

{¶ 15} In this case, the joinder test is clearly met. The two indictments tried together shared common features and charged similar crimes, but those crimes occurred on different days, had different victims, and were supported at trial by completely different witnesses and testimony. "Evidence meets the simple-and-direct standard if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense." *State v. Parham*, 10th Dist. No. 16AP-826, 2019-Ohio-358, ¶ 27, citing *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 52. *See also State v. Lott*, 51 Ohio St.3d 160, 163 (1990). There was never a danger that the jury would not be able to separate the two sets of crimes in its analysis—any theoretical confusion on this point was resolved by the trial court's instruction to the jury that "[y]ou must consider each count and the evidence applicable to each count separately, and you must state your finding as to each count uninfluenced by your verdict as to any other count." (Tr. at 964.) Moreover, Jamea failed to renew his objection to the joinder either at the close of the state's evidence or at the close of all evidence, thereby forfeiting all but plain error. *See, e.g.*, *Parham* at ¶ 21. Given that we cannot say that the trial court's denial of appellant's Crim.R. 14 motion was an abuse of its discretion, it is beyond doubt that it does not constitute plain error. Accordingly, Jamea's second assignment of error is overruled

{¶ 16} In his third assignment of error, Jamea asserts that he received ineffective assistance of trial counsel, in that counsel failed to renew Jamea's opposition to the consolidated trial, failed to request a limiting instruction regarding the use of "other acts" evidence, failed to object to alleged hearsay statements of Khalif made in the Circle K surveillance video, and by the totality of counsel's performance.

{¶ 17} To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced

the defense.  *See State v. Beatty*, 10th Dist. No. 08AP-52, 2008-Ohio-5063, ¶ 18, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland* at 694.  Put another way, the defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" the Sixth Amendment guarantees, *id.*, and counsel's performance must fall beyond the wide range of reasonable professional assistance.  *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101, citing *Strickland* at 689.  And in assessing such claims reviewing courts must remain mindful that "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "  *State v. Echols*, 10th Dist. No. 19AP-587, 2021-Ohio-4193, ¶ 40, quoting *Strickland* at 689 and *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  Unless both deficient performance and prejudice are shown it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.  *Strickland* at 689.

{¶ 18} On review, we conclude that Jamea has failed to demonstrate that his counsel's decisions were not the result of a legitimate trial strategy.  First, counsel had legitimate strategic reasons to forgo renewing the Crim.R. 14 motion for relief from joinder after the state's evidence was presented.  Specifically, the state's decision to play the video of Jamea's interrogation by the police permitted him to introduce a self-defense argument as to the Stonehenge Drive shooting without testifying, and the state's inadvertent failure to disclose the ballistic expert's report precluded it from calling that expert as a witness.  The ballistic expert's testimony would have established that the vast majority of the shell casings found at the May 15 crime scene came from appellant's gun.  Severing the cases at

the close of evidence would have required a mistrial, and therefore would have given the state an opportunity to disclose the report and present that evidence at a new trial. It would also have given the state the opportunity to forgo playing the video at a new trial, which would have required appellant to testify to establish his self-defense claim. In light of these possible developments, there were clear strategic benefits to abandoning the Crim.R. 14 motion.

{¶ 19} Likewise, there was a strategic benefit to refraining from requesting that the trial court provide the jury with a specific "other acts" instruction. As it stood, the trial court instructed the jury that its verdict as to each count must be "uninfluenced by your verdict as to any other count." (Tr. at 964.) Had Jamea's trial counsel requested an "other acts" instruction, the court would have instructed the jury that each of the acts could be used to establish any permissible purpose under Evid.R. 404(B) (motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, etc.) as to the other charged acts. Such an instruction might well have permitted the jury to use the testimony regarding the April 30 incident—testimony in which appellant was clearly identified by one of the victims and which did not allow for a self-defense claim—as evidence of the defendant's plan for the execution of the May 15 incident, as well as bolstering his identity as the perpetrator of that incident.

{¶ 20} And while there may have been no specific strategic benefit to counsel's failure to object Khalif's statement to the police at the Circle K that she did not know how Jamea was himself shot, neither has Jamea established such an objection would have been granted. He argues that the statement was hearsay but, in context, it could only have been offered to show an inconsistency with Jamea's version of the May 15 incident, rather than for its truth. The detectives only informed Jamea that Khalif had made that statement in

the context of his interrogation, and of obtaining Jamea's own version of the May 15 events. There was no reason to offer the statement for its truth at trial, particularly given the evidence presented that showed the statement was *false*—the Circle K video, and the testimony of all the witnesses regarding the Stonehenge Drive shootout.

{¶ 21} Finally, Jamea asserts that, "[e]ven if the quantum of prejudice resulting from any one of trial counsel's errors does not warrant reversal, the quantum of prejudice in the aggregate does." (Appellant's Brief at 46.) Because that we have found that Jamea has failed to demonstrate deficient performance by his trial counsel, he cannot demonstrate any prejudice stemming from such alleged deficient performance. Therefore, he has not suffered any "cumulative prejudice" either. For these reasons, his third assignment of error lacks merit and is overruled.

{¶ 22} In accordance with the foregoing, Jamea's three assignment of errors are overruled, and the judgments of the Franklin County Court of Common Pleas are affirmed.

*Judgments affirmed.*

SADLER, J., concurs.
JAMISON, J., concurs in judgment.

———————————

JAMISON, J., concurring in judgment.

{¶ 23} In appellant's first assignment of error, he alleges that the manifest weight of the evidence does not support the jury's verdict. It is notable that appellant does not challenge the sufficiency of the evidence. Under the manifest weight analysis, the appellate court engages in a "limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict." *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). In a criminal case, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67 (1964). "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. No. 22581, 2009-Ohio-525, ¶ 12.

{¶ 24} An appellate court when reviewing a manifest weight argument "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22. A

reviewing court of appeals should only reverse a trial court conviction on the grounds of being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983).

{¶ 25} Appellant argues that his conviction is against the manifest weight of the evidence because the jury lost its way by rejecting appellant's self-defense claim.  In appellant's view, the evidence supports that he acted in self-defense and the state did not demonstrate that he acted otherwise.  To act in self-defense when deadly force is used, appellant must show that he "(1) was not at fault in creating the situation giving rise to the affray, (2) that the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was the use of such force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 30.

{¶ 26} Self-defense historically has been an affirmative defense with the burden of proof on the defendant.  However, effective March 28, 2019, R.C. 2901.05 was amended to read as follows:

> (A) * * * The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused.
>
> (B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force

> in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶ 27}** R.C. 2901.05(B)(1) now provides for two burdens. The burden of production for a self-defense claim "remains with the defendant" and a defendant must produce evidence that supports defendant's claims that he used force in self-defense. *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 44. "The burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense." *State v. Davidson-Dixon*, 8th Dist. No. 109557, 2021-Ohio-1485, ¶ 18.

**{¶ 28}** If a defendant advances a self-defense theory, then the "state is required to disprove only one of the elements of self-defense beyond a reasonable doubt in order to sufficiently disprove a defendant's claim of self-defense." *Messenger* at ¶ 50. However, it is not against the manifest weight of the evidence "because the trier of fact believed the state's version of events over the defendant's version." *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43. "A defendant will not be entitled to reversal on manifest weight or insufficient evidence grounds merely because inconsistent testimony was heard at trial." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

**{¶ 29}** Once a claim of self-defense is made, the state must " 'disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.' " *Messenger* at ¶ 36, quoting *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2091.

{¶ 30} Appellant argues that his conviction is against the manifest weight of the evidence because the jury clearly lost its way in not believing his claim of self-defense. The jury heard testimony from individuals who were in the car and were shot at by appellant. People who were at or near the scene also testified. The jury was able to listen and make credibility determinations sufficient to find appellant guilty. Abdikhadir Abdi testified that appellant fired at him first and that he retrieved his firearm from the car and fired four shots at appellant in self-defense. (Mar. 11, 2020 Tr. Vol. 3 at 693-95.) The jury was free to believe or disbelieve his testimony.

{¶ 31} Appellant did not actually testify and his claims of self-defense stem from an interrogation video that was played at trial. Appellant emphasizes that the interrogation video is a strong indicator that appellant is not guilty, particularly the portion where appellant references a camera at the complex. No surveillance video from the complex was ever introduced into evidence. The detectives informed appellant that they did not know if the cameras worked.

{¶ 32} Appellant stated that he and his girlfriend had been driving around before stopping in an apartment complex where no one was around to smoke marijuana. Appellant then stated that he walked up to a car to purchase something when an individual pulled out a gun, but appellant took the firearm away from an individual and ran away, causing at least two individuals to shoot at him, striking him in the leg. After he was shot, appellant returned fire with the same firearm he had taken from the individual, even though he said he had never shot a gun before. Appellant and Saham Khalif then fled the scene and went to a convenience store where Khalif hid the firearm appellant had taken from Abdi behind the store and police apprehended appellant.

{¶ 33} Appellant clearly indicates that the individual with the firearm goes by the name of "Top Mali." However, Abdurahman Adan, the individual who was struck in the head by appellant while in the rear seat of the Camry during the gun battle, is the individual who uses the nickname of "Top Mali." (Tr. Vol. 3 at 651.) Adan testified that he was sitting in the left rear passenger seat of the Toyota when he was struck in the head by the very first bullet fired in the gun battle. (Tr. Vol. 3 at 555.)

{¶ 34} The location of the casings shed some light on the incident. Seventeen casings of the same brand, alleged to have been fired by appellant, are located in one specific area. Four casings, all the same brand but different from the grouping of 17 casings, alleged to have been fired by Abdi, are in a linear location, starting at the rear of his vehicle and ending at a point near the front of the vehicle tracking his movement while shooting from the rear to the front of the vehicle. The locations of the casings are consistent with evidence presented to the jury. According to appellant, he returned fire in self-defense with the firearm he grabbed from an individual standing outside the parked car. The physical evidence showed that 17 shots were fired at the four men, but the firearm appellant used and then tried to hide only had a capacity of 14 bullets. Obviously, the question is how did appellant reload and continue shooting with an unfamiliar firearm. The evidence does not square with appellant's theory.

{¶ 35} But who fired the first shot? It appears that the claim of self-defense centers on whether appellant or Abdi fired the first shot. N.K., the young man playing soccer nearby, testified that a red Hyundai driven by a female with a male passenger entered the parking lot, the male exited the car from the passenger's side, and N.K. immediately heard "a lot" of shots. (Mar. 10, 2020 Tr. Vol. 2 at 499.) Dacey Lamb, a visually impaired witness offered by the defense, testified that she heard several gun shots and saw Abdi take the very

last shot, but did not witness any activity prior to that, including appellant fleeing the scene. Abdi testified he was shot at first and returned four shots in self-defense. If believed, the testimony of Abdi showed appellant approached the four individuals and fired the first shot.

{¶ 36} The jury had the opportunity to observe the witnesses as they testified and determine whether they were credible. The jury believed that appellee's evidence was more credible than appellant's evidence. It is not our role to second guess the jury's reasoning in that regard since " ' "[i]t is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness." ' " *Salinas* at ¶ 37, quoting *State v. Haynes*, 10th Dist. No. 03AP-1134, 2005-Ohio-256, quoting *State v. Lakes*, 120 Ohio App. 213, 217 (1964). "Regarding the credibility of witnesses, we defer to the jury who was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying." *State v. McGee*, 8th Dist. No. 92019, 2010-Ohio-2081, ¶ 31.

{¶ 37} The state is only required to disprove one of the self-defense elements beyond a reasonable doubt to refute a defendant's claim of self-defense. The record below provides a basis for a determination that the jury did not lose its way in finding that the state proved appellant did not act in self-defense. I would hereby find that the manifest weight of the evidence supports appellant's conviction. Accordingly, I would overrule appellant's first assignment of error.

{¶ 38} In his second assignment of error, appellant argues that the trial court erred in joining the two indictments to be tried together. "Trial courts have considerable latitude in determining whether severance is warranted, and an appellate court will not reverse a trial court's decision to deny severance absent an abuse of discretion." *State v. Truss*, 10th Dist. No. 18AP-147, 2019-Ohio-3579, ¶ 18. However, in this matter, appellant objected to

the state's motion for joinder prior to trial but failed to renew his objection at the close of the state's case or at the conclusion of all the evidence. "A defendant forfeits a joinder issue by not renewing an objection to joinder at the close of the prosecution's case or at the conclusion of all evidence at trial." *State v. Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 37. Appellant has "forfeited all error arising from the denial of severance save plain error." *State v. Parham*, 10th Dist. No. 16AP-826, 2019-Ohio-358, ¶ 21. " 'Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Lott*, 51 Ohio St.3d 160, 164 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. " 'Plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper [joinder].' " *State v. Corker*, 10th Dist. No 13AP-264, 2013-Ohio-5446, ¶ 12, quoting *McGee* at ¶ 24, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996). Therefore, the appellate court applies a plain error standard of review.

{¶ 39} In general, the law favors joining multiple offenses in a single trial if the offenses charged "are of the same or similar character." *Lott* at 163. "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). However, "joinder of offenses of the same or similar character 'creates a greater risk of prejudice to the defendant,' especially where the benefits from consolidation are reduced because the otherwise-unrelated offenses involved different times, locations, victims, and witnesses." *State v. Armengau,* 10th Dist. No. 14AP-679, 2017-Ohio-4452, ¶ 99, *discretionary appeal denied*, 151 Ohio St.3d 1511, 2018-Ohio-365, quoting *Schaim* at 58, fn. 6.

**{¶ 1}** Joinder is governed generally by Crim.R. 8 which provides that:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

**{¶ 40}** While Crim.R. 8(A) allows a court to join indictments with offenses "of the same or similar character," courts have broadly construed the phrase "of the same or similar character" so that the offenses "need only be similar in nature, 'not identical in execution.' " *State v. Bennie*, 1st Dist. No. C-020497, 2004-Ohio-1264, ¶ 17-18, quoting *State v. Echols*, 128 Ohio App.3d 677, 708 (1998) (Gorman, J., dissenting); *see State v. Bass*, 10th Dist. No. 12AP-622, 2013-Ohio-4503, ¶ 9 (distinctions in the victims, locations, and times of the offenses "do not mean that the two indictments charge offenses of dissimilar character"). Crim.R. 13 provides that "[t]he court may order two or more indictments * * * to be tried together, if the offenses or the defendants could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment." Notwithstanding the policy in favor of joinder, Crim.R. 14 permits a defendant to request severance of the counts in an indictment "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses * * * in an indictment, * * * or by such joinder for trial together of indictments, * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

**{¶ 41}** To prevail under the plain error standard, a defendant must establish that: (1) an error occurred, (2) it was obvious, and (3) it affected his or her substantial rights, i.e., it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain

error does not exist unless the appellant establishes "that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions." *Waddell* at 166. Under the plain error standard of review, appellant has not met its burden.

{¶ 42} To succeed on a claim that the trial court erred in refusing to sever indictments joined by Crim.R. 13, a defendant must show " '(1) that his rights were prejudiced, (2) "that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial," and (3) "that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." ' " *Corker* at ¶ 20, quoting *McGee* at ¶ 23, quoting *Schaim* at 59. Appellant bears the burden to " ' "either *affirmatively demonstrate* before trial that his rights would be prejudiced by the joinder, or to show at the close of the state's case, or at the conclusion of all the evidence, that his rights actually had been prejudiced by the joinder." ' " (Emphasis sic.) *Id.* at ¶ 21, quoting *State v. Strobel*, 51 Ohio App.3d 31, 33 (3d Dist.1988), quoting *State v. Williams*, 1 Ohio App.3d 156, 159 (10th Dist.1981). To be clear, " 'there is always the possibility of prejudice in joining separate instances of any offense in the same indictment.' " *Id.*, quoting *Strobel* at 32.

{¶ 43} Appellant must provide specific information to allow the trial court to make an informed analysis regarding the favoring of joinder versus ensuring a defendant a fair trial. *Truss*, citing *State v. Torres*, 66 Ohio St.2d 340 (1981). Appellant argued at the joinder hearing that he was prejudiced by the joinder of the two indictments but did not demonstrate in what way was he prejudiced. Appellant claims that his defense was prejudiced by joining the two indictments because it constrained his right to testify in one case but not the other and impacted his presumption of innocence. Standing alone, these

bare assertions do little to provide the court with the information needed to make an accurate determination.  In *Baker*, a case cited by appellant, the appellate court addressed a defendant's desire to sever a multi-count indictment on the basis that he intended to testify on some counts but not others and in affirming the trial court's decision not to sever, stated that "it is essential that the defendant present enough information -- regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other -- to satisfy the court that the claim of prejudice is genuine." *Baker v. United States*, 401 F.2d 958, 977 (D.C.Cir.1968).  The defendant stated a specific reason regarding why he wanted to remain silent on some counts but "[n]o mention, however, was made of the nature and importance of the testimony he wished to give on the other counts." *Id.*  Here, other than vague and general statements, appellant did not present any specific information regarding prejudice to the trial court.  "Bare allegations are insufficient to establish prejudice." *State v. Palmer-Tesema*, 8th Dist. No. 107972, 2020-Ohio-907, ¶ 43.  "[A] trial court does not abuse its discretion in refusing to grant severance where the prejudicial aspects of joinder are too general and speculative." *State v. Payne*, 10th Dist. No. 02AP-723, 2003-Ohio-4891, ¶ 28.

{¶ 44} The state can negate a defendant's claim of prejudice in two different ways.  Under the first method, known as the "joinder test," joinder is permitted if, regardless of the admissibility of the evidence, the evidence relating to each charge is "simple and distinct." *Bass* at ¶ 23.  Under the second method, known as the "other acts" test, joinder is not prejudicial if evidence regarding one offense would be admissible in a trial of the other offense, pursuant to Evid.R. 404(B). *Lott* at 163.  The tests are disjunctive and "the satisfaction of one negates an accused's claim of prejudice without consideration of the other." *Truss* at ¶ 17.  " 'If the state can meet the joinder test, it need not meet the stricter

"other acts" test.' " *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000), quoting *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 45} The joinder test is designed to prevent a jury from improperly commingling the evidence "instead of carefully considering the proof offered for each separate offense." *State v. Mills*, 62 Ohio St.3d 357, 362 (1992). Evidence is " ' "simple and direct" if the jury is capable of readily separating the proof required for each offense, if the evidence is unlikely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." ' " *State v. Wright,* 4th Dist. No. 16CA3, 2017-Ohio-8702, ¶ 52, quoting *State v. Freeland*, 4th Dist. No. 12CA3352, 2015-Ohio-3410, ¶ 14, quoting *State v. Skates*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 34; *State v. Rhoades*, 10th Dist. No. 19AP-93, 2020-Ohio-2688, ¶ 19, citing *State v. Wilson*, 10th Dist. No. 10AP-251, 2011-Ohio-430, ¶ 23. Evidence of multiple offenses is "simple and direct" where the offenses involved different victims, different incidents of factual scenarios, and different witnesses. *State v. Dantzler*, 10th Dist. No. 14AP-907, 2015-Ohio-3641, ¶ 23. "Evidence meets the simple-and-direct standard if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense." *Parham* at ¶ 27. " 'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.' " *State v. Echols*, 8th Dist. No. 102504, 2015-Ohio-5138, ¶ 16, quoting *State v. Lewis*, 6th Dist. No. L-09-1224, 2010-Ohio-4202, ¶ 33. Even if evidence of other acts would be precluded by Evid.R. 404(B) if the two indictments were joined and tried in one trial, "the defendant cannot show prejudice arising from joinder of the indictments if the evidence relevant to

the charges in each case is simple and distinct." *State v. N.S.*, 10th Dist. No. 20AP-66, 2020-Ohio-5318, ¶ 39.

{¶ 46} Here, the evidence to support the charges against the two groups of victims is both simple and direct. Proving appellant guilty of the charges in the two indictments rests largely on the credibility and testimony of the victims and the jury should be able to separate the evidence of each shooting without confusion. Neither the April 30 nor the May 15 incident involved complex fact patterns that would confuse a jury. The two incidents were presented in an orderly, chronological manner with only witnesses involved in that particular shooting testifying, although a law enforcement witness did testify out of sequence due to scheduling issues, and that matter was communicated to the jury.

{¶ 47} While both incidents involved felonious assaults, the April shooting involved appellant allegedly shooting at four young women retrieving their clothes from an apartment complex dumpster and no one was seriously injured, while the May shooting involved appellant allegedly shooting at four young men in a car parked at a different apartment complex and two people, including appellant, were shot and seriously injured. The evidence from the April incident was provided by the victims of the shooting and eyewitness testimony by Andrea Curtiss, corroborated by the physical evidence at the scene. The evidence from the May incident was provided by the victims of the shooting and eyewitness testimony from N.K. and Lamb, corroborated by the physical evidence at the scene. Each witness testified only as to their case and provided detailed and discrete testimony. While each shooting was of similar character, the two indictments arise out of incidents that occurred on different days with different victims in different locations and involved different conduct.

**{¶ 48}** The state presented simple and direct evidence relating to each of the two incidents. The record reflects that the evidence pertaining to each set of victims is separate and distinct and easily segregated. Further, the state presented each set of victims' testimony separately to avoid confusing the evidence. "Because the critical evidence supporting the convictions was the testimony of the respective victims, we find that it would be a simple matter for the jury to distinguish between the evidence" in the two indictments. *N.S.* at ¶ 40.

**{¶ 49}** The trial court limited prejudice by instructing the jury to consider each count separately as follows:

> The charges set forth in each count constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your finding as to each count uninfluenced by your verdict as to any other count. The defendant may be found guilty or not guilty of any one or all the offenses charged.

(Mar. 12, 2020 Tr. Vol. 4 at 964.)

> You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence.
>
> To weigh the evidence you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives.
>
> These tests include the appearance of each witness upon the stand; the witness' manner of testifying, the reasonableness of the testimony; the opportunity the witness had to see, hear, and know the things concerning the testimony; the accuracy of the witness' memory; frankness, or lack of it; intelligence; interest; and bias, if any; together with all the facts and circumstances surrounding the testimony.
>
> *Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.*
>
> You're not required to believe the testimony of any witness simply because he or she was under oath. You may believe or

> disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

{¶ 50} (Emphasis added.) *Id.* at 954-55. The jury was correctly instructed to determine the credibility of each witness, and "we presume the jury followed the trial court's instruction and applied the proper standard in assessing a witness's credibility." *N.S.* at ¶ 50. The admonition to the jury makes it "extremely remote" that the jury will be confused. *Bass* at ¶ 23.

{¶ 51} Even though the joinder test is dispositive of the issue, the other-acts test may also support joinder. Evid.R. 404(B) does not allow the use of evidence of a defendant's other acts solely to prove that a "defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

{¶ 52} "Generally, the admission or exclusion of evidence lies within the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion." *State v. Daylong*, 10th Dist. No. 19AP-279, 2021-Ohio-4192, ¶ 22. However, whether evidence of other acts is admissible under Evid.R. 404(B) is a "question of law" that we review on a de novo standard of review. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

{¶ 53} The Supreme Court of Ohio has established a road map to analyze the admission of other-acts evidence. There is a "long-standing principle that other-acts evidence may not be used to establish a defendant's propensity to commit crime or to

demonstrate that an accused committed the crime in question because of her or his proclivity to commit crime in general. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 21. To be admissible, the other-acts evidence must be 'probative of a separate, nonpropensity-based issue.' *Id*. at ¶ 22." *State v. Shepard*, 1st Dist. No. C-190787, 2021-Ohio-964, ¶ 34.

{¶ 54} The threshold issue is whether the evidence is relevant for a nonpropensity purpose. *Hartman* at ¶ 24. Relevant evidence makes the "existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In determining relevancy, a court "must evaluate whether the evidence is relevant *to the particular purpose* for which it is offered." (Emphasis sic.) *Hartman* at ¶ 26. That purpose "must go to a 'material' issue that is actually in dispute between the parties." *Id*. at ¶ 27. In an attempt to dissuade a party from presenting "a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo," other-acts evidence is "relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689 (1988). The Supreme Court of Ohio has held, regarding other acts, that "it is sufficient for the admission of such evidence that it offers substantial proof that the alleged similar act was committed by the defendant." *State v. Carter*, 26 Ohio St.2d 79, 83 (1971).

{¶ 55} The next step is to weigh the probative value of the other-acts evidence against its prejudicial effect and determine if the evidence "is nevertheless more prejudicial than probative." *Hartman* at ¶ 29. "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis," and is "reviewed for an abuse of discretion." *Id*. at ¶ 30. A trial court should consider the extent to which

the other-acts evidence is directed to an issue in dispute and whether the state can present other evidence that proves the same fact with less prejudicial evidence. *Id.* at ¶ 31-32. In addition, if the fact is not disputed or is not material to the matter, the other-acts evidence has little probative value but a high risk of prejudice, and as the level of importance of the factual dispute increases, the probative value also increases while the risk of prejudice decreases. *Id.* at ¶ 31. "[W]hen such evidence is only slightly probative of a nonpropensity theory but has a high likelihood of unfairly prejudicing the defendant or confusing or misleading the jury, the evidence must be excluded." *Id.* at ¶ 33.

{¶ 56} Finally, upon a determination that other-acts evidence is properly admissible, the trial court must take affirmative steps to minimize any danger of unfair prejudice and curtail the use of the evidence only for a proper purpose. *Id.* at ¶ 34. " '[O]ther-act evidence is usually capable of being used for multiple purposes, one of which is propensity.' " *Id.* at ¶ 23, quoting *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir.2014) (*en banc*). As a result, a defendant advocating for the use of other-acts evidence for a purpose other than propensity must provide " 'the chain of reasoning that supports the non-propensity purpose' " to allow the court to "determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." *Hartman* at ¶ 23, quoting *Gomez* at 856. The court should place both the specific, nonpropensity purpose and the basis for its admission on the record and provide a jury instruction for clarity. *Id.* at ¶ 34.

{¶ 57} The state asserts that evidence of the May 15 shooting is admissible in a trial for the April 30 shooting to prove appellant's identity based on his modus operandi. "Evidence of modus operandi is relevant to prove identity" where a perpetrator's identity is an issue at trial. *Hartman* at ¶ 37. The admission of other-acts evidence is allowed as

" '[e]vidence that the defendant had committed uncharged crimes with the same peculiar modus operandi to identify the defendant as the perpetrator of the charged crime.' " (Citation omitted.) *Id.*

{¶ 58} Curtiss testified that she witnessed appellant shooting at the four girls until he had unloaded the firearm's magazine and then driving away in a red Hyundai. The victims of the April 30 shooting stated that appellant left the scene driving his red Hyundai. We know that appellant left the scene of the May 15 shooting in a red Hyundai.

{¶ 59} Appellant hangs his hat on the assertion that he was not present at the April 30 shooting. Because there was a legitimate dispute about the shooter's identity in the April 30 shooting, and the other-acts evidence is admissible for that nonpropensity purpose, the court must then weigh the probative value of the evidence against the risk of unfair prejudice and jury confusion. *Smith* at ¶ 50. The evidence that identifies appellant at the scene of the April 30 shooting is relevant because it tends to make the fact that appellant was the shooter more probable. The evidence "is relevant to the particular purpose for which it is offered," which is identity. *Hartman* at ¶ 26. However, the fact that there were four people in each shooting appears to be more of a coincidence and not a factor going to modus operandi.

{¶ 60} In the instant case, the use of other-acts evidence may be tendered for identification purposes, which is an authorized use under Evid.R. 404(B). However, because the two crimes are separate and distinct, the use of other-acts evidence is moot and not prejudicial in this case.

{¶ 61} In his third assignment of error, appellant argues that he received ineffective assistance from his trial counsel. In Ohio, a properly licensed attorney is presumed competent. *State v. Davis*, 10th Dist. No. 09AP-869, 2010-Ohio-4734. The burden of

demonstrating ineffective assistance of counsel is on the party making the claim. *Id.* "Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *Wilson*, 2011-Ohio-430, at ¶ 28, citing *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998).

{¶ 62} Performance of counsel will not be considered ineffective unless his or her actions were deficient and resulted in actual prejudice to a defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance will only be deemed deficient if it "fell below an objective standard of reasonableness." *Id.* at 688. A defendant is only prejudiced by counsel's performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In order to succeed on an ineffective assistance claim, appellant must satisfy a two-part test. First, appellant "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* at 687. To demonstrate prejudice, appellant "must establish there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the trial would have been different." *Wilson*, 2011-Ohio-430, at ¶ 29.

{¶ 63} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." *Strickland* at 689.

{¶ 64} Appellant first advances that counsel was ineffective for failing to renew an objection to joinder at the close of the state's evidence. However, as a matter of trial strategy counsel is afforded some latitude. It must be noted that appellant concedes that "trial counsel's failure to renew the objection at trial was immaterial" and that any prejudice "was purely procedural in nature." (Appellant's Brief at 41.) Further, the evidence presented during the joint trial did not generate any new information. It is likely that counsel had an opportunity to evaluate the case at the close of the state's evidence and decide as a matter of strategy not to renew the objection. Counsel was aware of a potentially damaging ballistics report the state could not use in the joined trials but would be available if the objection made after the close of the state's case would have been sustained and new separate trials ordered. Likewise, it is far from a certainty that the trial court would have sustained such an objection. It is imperative that an ineffective assistance of counsel claim not serve as an end-around to a failure to object. *Strickland* at 689-90. Counsel's failure to object does not rise to the level of ineffective assistance of counsel.

{¶ 65} Appellant also raises an ineffective assistance claim by noting that counsel failed to request an instruction forbidding the use of other-acts evidence. As discussed earlier, the trial court issued an instruction that defined each count as a "separate and distinct matter" and charged the jury to "consider each count and the evidence * * * separately" and "state your finding as to each count uninfluenced by your verdict as to any other count." (Mar. 13, 2020 Tr. Vol. 4 at 964). There is no suggestion by appellant that a different instruction would have resulted in a different outcome.

**{¶ 66}** Appellant also believes counsel was deficient by not objecting to hearsay statements allegedly uttered by his girlfriend, Saham Khalif. From a strategic perspective, counsel may have preferred the video statements as opposed to Khalif's live testimony. In addition, playing the video broadcast appellant's self-defense argument without having to testify. In the lack of a showing of any change in outcome, counsel was not ineffective. And finally, appellant points to the totality of the counsel's performance as being ineffective.

**{¶ 67}** There is no showing of deficient performance by counsel or prejudice suffered by appellant. I would overrule the third assignment of error.

**{¶ 68}** Having found no merit to appellant's first, second, and third assignments of error, I would affirm the judgment of the Franklin County Court of Common Pleas.

—————————————